IN OPEN COURT
AUG - 2 2018
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) CRIMINAL NO. 2:18cr |
| | ) |
| SAMUEL CARAGAN, | ) |
| | ) |
| Defendant. | ) |

## STATEMENT OF FACTS

The parties stipulate that the allegations in the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

1. The defendant, SAMUEL CARAGAN, has known Person 1 for many years. Beginning in or about 2005, Person 1 and Person 2 managed a company in Virginia Beach, Firm D. During all periods relevant to the Criminal Information, Firm D's primary business was selling products to the federal government.

2. Sometime in 2007, Person 1 and Person 2 met with Caragan to discuss a business proposition. At the time, Caragan lived and worked in northern Virginia and had never met Person 2. Together, Person 1 and Person 2 encouraged Caragan to form his own company. Such a company would, like Firm D, be dedicated to selling products to government customers, and would, like Firm D, be based in Virginia Beach. Person 1 and Person 2 told Caragan that they would teach him how to start a small business and would help him run his own company. At the time, Caragan had only modest experience in government contracting and no experience running his own firm. Even so, Caragan agreed to move to Virginia Beach to start his own company, as Person 1 and Person 2 had suggested.

3. By the fall of 2007, Caragan had relocated to Virginia Beach. In or about November 2007, with the assistance of others, Caragan incorporated his own company, Firm C, with the Virginia State Corporation Commission. The incorporation documents listed Caragan as Firm C's sole member.

4. Shortly after Caragan moved to Virginia Beach, it became apparent that he was not going to have a meaningful role in managing Firm C at all. Instead, Person 1 and Person 2 arranged for Caragan to operate a retail storefront for Firm C located within the headquarters of another company. In this position, Caragan sold mostly small quantities of products to members of the general public. Between 2007 and 2014, Caragan primarily operated the retail storefront while Firm D controlled nearly all of Firm C's actual functions.

5. Firm C eventually developed a multi-million dollar contracting business selling products to the federal government. Between 2007 and 2014, Caragan had practically no insight into this business, as it was run almost entirely by employees or former employees of Firm D.

6. It was not until early 2015, after Person 1 and Person 2 had left Firm D, that Caragan began to exert control over Firm C. For example, before 2015:

   a. Caragan drafted few communications with government regulators. Instead, Person 1, Person 2, or others associated with Firm D ghost-wrote such communications, which then were sent out under Caragan's name.

   b. Caragan did not have access to the primary bank account used by Firm C to support its government contracting business.

   c. Caragan had little to no role in hiring Firm C's employees.

   d. Caragan had no say regarding his own compensation, instead simply accepting whatever salary Person 1 and Person 2 chose to pay him.

2

7. Between 2007 and 2014, Person 1, Person 2, and Firm D extracted money from Firm C in a variety of ways. These included consulting fees, rent, and other purportedly business-related expenses. Because he did not have insight into Firm C's finances before 2015, Caragan never developed a full understanding of the extent to which money flowed from Firm C to Firm D and its employees.

8. Caragan came to understand that Firm D was a participant in the Section 8(a) program overseen by the Small Business Administration ("SBA"). Under this program, small businesses owned and controlled by economically and socially disadvantaged persons are eligible to obtain various kinds of SBA assistance and to receive certain preferences in the award of federal contracts. For example, in certain circumstances, federal contracting officials can award procurements to 8(a) firms on a "sole source" basis, meaning that such contracts can be awarded absent competing offers from other firms. In addition, federal contracting officers can, subject to certain limitations, restrict competition on a procurement to 8(a) firms. These opportunities are colloquially known as "set-aside" contracts.

9. A firm is eligible to join the 8(a) program if "it is a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals." 13 C.F.R. § 124.101. In addition, "no non-disadvantaged individual or immediate family member may . . . [e]xercise actual control or have the power to control" an 8(a) firm. 13 C.F.R. § 124.106(e)(1).

10. The purpose of the 8(a) program "is to assist eligible small disadvantaged business concerns compete in the American economy through business development." 13 C.F.R. § 124.1. To that end, firms may only participate in the 8(a) program for nine years. 13 C.F.R. § 124.2. As an 8(a) firm approaches the end of its nine-year term, it must work with

3

the SBA to ensure that it "do[es] not develop an unreasonable reliance on 8(a) awards." 13 C.F.R. § 124.509(a)(1). Firms must also submit business plans to the SBA that outline their "prospects for profitable operations during and after [their] participation in the 8(a) [business development] program." 13 C.F.R. § 124.402(c)(3).

11. Because the 8(a) program seeks to empower participating firms to succeed on their own in the marketplace, "[o]nce a concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) [business development] program, neither the concern nor that individual will be eligible again." 13 C.F.R. § 124.108(b).

12. Firm D received its 8(a) certification from the SBA in November 2001. The certification lasted for a non-renewable term of nine years, expiring in November 2010.

13. Person 1 and Person 2 eventually explained to Caragan that Firm D's 8(a) status was set to expire in 2010. They told Caragan that they wanted Firm C to obtain its own 8(a) certification so that persons working for Firm D—including Person 1 and Person 2—could continue pursuing valuable 8(a) contracts for which they would otherwise be unable to compete. Firm C applied to join the 8(a) program in or about June 2010 on the basis of Caragan's disadvantaged status. It received its 8(a) certification in or about December 2010.

14. In the course of interacting with the SBA between 2010 and 2014, Caragan made numerous false, fraudulent, and misleading statements.

15. For example, Caragan signed Firm C's 8(a) application, attesting to its "truthfulness, accuracy, and validity." The application nevertheless contained false statements.

   a. The application required Firm C to disclose any "affiliation" with another entity. The application explained that "affiliation" in this context "may be present when there is common management, ownership, or control between

4

the applicant business concern and another business concern or when there are contractual relationships, prior relationships, familial ties, common investments or economic dependence on another business concern." Despite the fact that the relationship between Firm D and Firm C clearly satisfied many of these criteria, when asked on the application if Firm C had "an affiliation with . . . any other business concern," Caragan answered "no."

b. The application asked whether "any outside entity(ies) or individual(s)" provided financial support, office space, or equipment to Firm C. Firm D provided these benefits to Firm C, yet Caragan answered "no."

c. Caragan indicated on the application that he devoted 80 hours per week to the "management of [Firm C]." In reality, he worked far fewer than 80 hours per week running Firm C's retail storefront.

16. In or about February 2011, Caragan signed an 8(a) "Participation Agreement" with the SBA. In this document, Caragan acknowledged several reasons for which the SBA could terminate Firm C from the 8(a) program. These included:

a. "Failure by [Firm C] to maintain its eligibility for program participation";

b. Failure by Caragan "to maintain ownership, full-time day-to-day management, and control" of Firm C; and

c. "Failure to report changes that adversely affect the program eligibility of an applicant."

17. Despite signing the Participation Agreement, Caragan never notified the SBA of the relationship between Firm D and Firm C, nor did he ever disclose the fact that he exercised only minimal control over Firm C.

5

18. In or about December 2011, Firm C submitted a business plan to the SBA. It contained numerous false and misleading statements, including:

   a. "[Firm C] is headed by me, Sam Caragan." This was false and misleading. In reality, Caragan exercised minimal authority over Firm C.

   b. "I, Sam Caragan, have the major responsibility for marketing, financial management, scheduling, cost estimates, bid and proposal development, quality control, and day to day project management oversight." This was false. Caragan had little to no control over most or all of these functions.

   c. "Sam Caragan has full and complete oversight of all contracts." This was also false. Caragan had practically no insight into Firm C's contracting business.

19. On or about July 9, 2014, the SBA's Richmond District Office sent Caragan a letter asking various questions about Firm C's continuing eligibility for the 8(a) program. Among other things, the letter asked Caragan to "[i]dentify the individual responsible for the day-to-day management of [Firm C]."

20. On or about July 24, 2014, Firm C sent its response to the SBA's letter. It stated, in part: "Samuel M. Caragan is responsible for day-to-day management of [Firm C]." This was false and misleading. In reality, Caragan ran Firm C's retail operation with minimal responsibility for Firm C's day-to-day management and with little to no insight into Firm C's primary business of selling products to the federal government.

21. Caragan reviewed Firm C's July 24 response to the SBA and certified that it was "true and accurate." He also certified that he understood that the "SBA [was] relying on this information in making its determination of [Firm C's] eligibility for the 8(a) [business

6

development] program." Caragan took these affirmative acts knowingly and willfully, fully aware that the letter contained a materially false statement. At the time he reviewed and signed the certifications accompanying the July 24 letter, Caragan knew that making false statements to the SBA was unlawful.

22. Caragan made the false statement in the July 24 letter for the purpose of influencing the SBA's determination about Firm C's continuing eligibility for the 8(a) program. He did so while living in Virginia Beach, Virginia, and while Firm C was headquartered in Virginia Beach, Virginia, all within the Eastern District of Virginia.

23. Government agencies are responsible for collecting and reporting data on federal contracts through the Federal Procurement Data System ("FPDS"). According to FPDS records, between 2011 and 2014 Firm C was awarded approximately $20.3 million in 8(a) contracts. In the period between July 24, 2014, and December 31, 2014, FPDS records reflect that Firm C won approximately $928,800 in 8(a) contracts. Records maintained by Firm C also indicate that, between January 1, 2011, and August 31, 2014, its marginal profits on sales averaged approximately 6.56%. At that rate, Firm C's marginal profits on 8(a) sales were approximately $1.3 million between 2011 and 2014 and approximately $60,900 between July 24, 2014, and December 31, 2014.

24. This Statement of Facts is a summary of the principal facts that constitute the legal elements of the offense charged in the Criminal Information. This summary does not describe all of the evidence that the United States would present at trial or all of the relevant conduct that could be used to determine Caragan's sentence under the Sentencing Guidelines. Caragan acknowledges that the foregoing Statement of Facts does not describe all of his conduct



relating to the offense charged in the Criminal Information nor does it identify all of the persons with whom Caragan may have engaged in illegal activities.

                        Respectfully submitted,

                        G. Zachary Terwilliger
                        United States Attorney

By: *[signature]*
                        Daniel T. Young
                        Alan M. Salsbury
                        Assistant United States Attorneys

After consulting with my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Samuel Caragan, Defendant

I am Samuel Caragan's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Lawrence H. Woodward, Jr., Esq.
Attorney for Samuel Caragan

9