1

```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF VIRGINIA
 2                       NORFOLK DIVISION


 3


 4  UNITED STATES OF AMERICA,      )
                                   )
 5              Plaintiff,         )
                                   )
 6  v.                             )    Criminal Action No.:
                                   )         2:18cr106
 7  SAMUEL CARAGAN,                )
                                   )
 8              Defendant.         )


 9


10                  TRANSCRIPT OF PROCEEDINGS


11                      (Sentencing)


12

                       Norfolk, Virginia
13                     July 10, 2019


14


15  BEFORE:        THE HONORABLE MARK S. DAVIS
                   United States District Judge
16


17


18  Appearances:

19         OFFICE OF THE UNITED STATES ATTORNEY
                  By: DANIEL YOUNG
20                    ALAN SALSBURY
                      Counsel for the United States
21
           RULOFF, SWAIN, HADDAD, MORECOCK, TALBERT & WOODWARD, P.C.
22                By: LAWRENCE H. WOODWARD, JR.
                      Counsel for Defendant
23
           The Defendant appearing in person.
24


25
```

Paul L. McManus, RMR, FCRR Official Court Reporter

1                    P R O C E E D I N G S

2

3          (Proceedings commenced at 10:08 a.m. as follows:)

4

5          COURTROOM DEPUTY CLERK:  In Case No. 2:18cr106, the

6    United States of America v. Samuel Caragan.

7          Mr. Young, is the government ready to proceed?

8          MR. YOUNG:  The government is ready to proceed.  Good

9    morning, Your Honor.

10         THE COURT:  Good morning, Mr. Young.

11         COURTROOM DEPUTY CLERK:  Mr. Woodward, is the

12    defendant ready to proceed?

13         MR. WOODWARD:  We are, Your Honor.  Good morning.

14         THE COURT:  Good morning, Mr. Woodward.

15         Would you step forward, please, with Mr. Caragan so

16    the clerk can administer the oath to Mr. Caragan?

17         (Defendant placed under oath.)

18         THE COURT:  All right.  Let's review a little bit of

19    the history here.

20         On July 11, 2018, the Court entered an order

21    authorizing a U.S. magistrate judge to conduct the guilty plea

22    proceedings in this case, and then on August 2nd, Mr. Caragan

23    requested and consented to a magistrate judge conducting the

24    guilty plea proceedings.  On that same day, he appeared before

25    Judge Robert Krask, waived indictment, and in accordance with

```
 1    the terms of a written plea agreement, pled guilty to one count

 2    of a criminal information; that is, Count 1, making a false

 3    statement to the Small Business Admission, in violation of Title

 4    15 of the United States Code, Section 645(a).  Judge Krask

 5    accepted the guilty plea, and the matter was then continued for

 6    sentencing.

 7            The Court has now of course received and considered

 8    the presentence report that was prepared on January 16, 2019,

 9    along with the addendum that was prepared on June 13 of 2019.

10    The Court has considered that.  And in addition, the Court has

11    before it the statement of facts from the related case against

12    Ronald Villanueva which is attached to the defendant's position

13    paper at Document 23-1.  I have the letter from Mr. Caragan.

14    And that, I don't believe, is filed on the docket, and so would

15    you like that placed in the probation office file?  How do you

16    want to...

17            MR. WOODWARD:  Yes, Your Honor.  Usually just so they

18    won't be available to the public I prefer it to just be attached

19    to the presentence report and put in the probation file, yes,

20    sir.

21            THE COURT:  You want his letter attached to the

22    presentence report --

23            MR. WOODWARD:  Or just --

24            THE COURT:  -- to go to the Bureau of Prisons?

25            MR. WOODWARD:  -- probation if it goes there.  The
```

4

1   probation officer is fine as well, Your Honor, to put it in

2   their file is fine.

3          THE COURT:  I'll tell you what.  I'm going to place it

4   the probation officer's file.  There's nothing of a significant

5   medical history, anything like that that the Bureau of Prisons

6   would need to know to properly treat him or classify him, so

7   I'll place that in the probation officer's file.

8          I've considered Addendum A to the government's

9   position paper, that's Page A of the government's position

10  paper.  And we have the letter from the Small Business

11  Administration about restitution and loss amount.  And so those

12  are the things that I have considered.  In mentioning

13  restitution and loss amount I apologize for starting a few

14  minutes late here.  I was still looking at the government's most

15  recent supplemental position statement on the restitution and

16  trying to work through that.

17         So that's what the Court has before it.

18         In addition to the position papers of the parties, Mr.

19  Woodward, I'm now prepared to accept the plea agreement and make

20  the finding of guilt based upon the magistrate judge having

21  asked many questions of Mr. Caragan to determine whether he was

22  pleading guilty freely, knowingly and voluntarily and

23  intelligently.  Judge Krask asked all those questions and

24  determined that Mr. Caragan was pleading guilty in that fashion,

25  and so I am now prepared to accept that plea agreement and make

1  that finding of guilt.  Is there any reason I should not do

2  that, Mr. Woodward?

3          MR. WOODWARD:  No, sir, there's no reason.

4          THE COURT:  Mr. Caragan, is there any reason I should

5  not do that?

6          THE DEFENDANT:  No, sir.

7          THE COURT:  All right.  Then I do accept the plea

8  agreement and I do make the finding of guilt.

9          Now, there are a couple things that I do want to

10  address with you all about the presentence report, and I'll ask

11  the probation officer to follow this all also.

12          In Paragraph 36 of the presentence report, if you all

13  have that in front of you, it says that we're using the 2016

14  Guidelines Manual, and it should say we're using the 2018

15  Guidelines Manual.  I'm going to ask the probation officer to

16  make that change.  Actually that's easy enough, I can change the

17  6 to the 8 and initial it.  No objection?

18          MR. WOODWARD:  No objection, Your Honor.

19          MR. YOUNG:  No, Your Honor.

20          MR. WOODWARD:  I missed that.

21          THE COURT:  All right.  Now, next thing, the fine

22  range in Part D is currently 20,000 to 200,000 which is the

23  range under the 2018 guidelines.  Pursuant to Guideline

24  5E1.2(c)(3), it states for offenses committed prior to

25  November 1, 2015, the applicable guideline range that was set

1   forth in the version of 5E1.2(c) that was in effect on

2   November 1, 2014 should be used instead.  This offense appears

3   to have been committed entirely before November 1, 2015, and so

4   the fine range stated in Part D based on defendant's offense

5   level of 23 should be 10,000 to 100,000.

6          Paragraph 82 also says the minimum fine is 20,000, and

7   so that should be changed to 10,000.  And I'm going to go ahead

8   and ask the probation officer, if there's no objection, to make

9   those changes once we finish here.

10          MR. WOODWARD:  No objection, Your Honor.

11          MR. YOUNG:  None, Your Honor.

12          THE COURT:  All right.  And just so -- this is minor,

13   but just so the presentence report accurately reflects the stage

14   where we are, in Paragraph 6 regarding it stating that

15   Mr. Ronald Villanueva's jury trial is pending, of course that's

16   taken place, and I will ask the probation officer just to make

17   that change afterwards to reflect that it's already taken place.

18          MR. WOODWARD:  Actually, Your Honor, I think

19   Mr. Villanueva ended up pleading guilty, not having a trial.

20   But he has been -- there's certainly no jury trial pending

21   anymore.

22          THE COURT:  Yes.  So it should say there is no jury

23   trial pending and he had pled guilty.

24          So that's, I think, all the preliminary changes that I

25   see.

```
 1              Mr. Woodward, have you had a chance to review the

 2    presentence report with the addendum and had enough time to

 3    review it with Mr. Caragan?

 4              MR. WOODWARD:  I have, Your Honor.

 5              THE COURT:  Other than the jointly raised issue about

 6    loss amount and restitution, did you see any other errors in the

 7    presentence report that you need to bring to my attention?

 8              MR. WOODWARD:  No sir.

 9              THE COURT:  All right.  Mr. Caragan, have you had a

10    chance to review the presentence report and the addendum?

11              THE DEFENDANT:  Yes, I have Your Honor.

12              THE COURT:  Did you have enough time to review it with

13    Mr. Woodward?

14              THE DEFENDANT:  Yes, sir.

15              THE COURT:  All right.  Other than the issue raised by

16    your attorney as I just mentioned was raised jointly with the

17    government about loss amount and restitution amount, did you see

18    any other errors in the presentence report?

19              THE DEFENDANT:  No, I have not, Your Honor.

20              THE COURT:  All right.  You looked like you weren't

21    sure.

22              THE DEFENDANT:  No.  I haven't seen any errors.

23              THE COURT:  Okay.  So obviously no presentence report

24    is going to be a 900-page biography of any individual that

25    appears before me, but do you think that this presentence report
```

1  fully covers your background and advises me of the things I need

2  to know about?

3           THE DEFENDANT:  Yes, it does, Your Honor.

4           THE COURT:  All right.  Thank you.

5           That brings us to then the disputed issues.  Let's

6  talk about loss amount first.  I guess, Mr. Caragan you can have

7  a seat back at counsel table.

8           MR. WOODWARD:  Your Honor, you're not going to let me

9  sit down too, Your Honor?  I'm just kidding.  This is a bit of a

10 morass, I understand.

11          THE COURT:  I could raise it with either party, I

12 guess.

13          MR. WOODWARD:  I'll go -- I'll take the licks first.

14          THE COURT:  All right.  So it's not a formal

15 objection, No. 1, but it helps to drive the guideline range --

16 or it does drive the guideline range, in part.  So there's a, I

17 guess, temptation so to speak to treat it as a variance request;

18 that is, Judge, we're not making a formal objection, but treat

19 in your final sentence this as if you used our agreed-upon loss

20 amount and impose a variant sentence.  And I'm, it's easy to get

21 lost in that method of thinking here.  So I'm seeking a little

22 bit of help from you all about how you want me to handle the

23 loss amount for guideline purposes issue.  I know what my

24 thinking is on it, what I think on that, but I also, as I have

25 said many times, every judge has their own view, I think, about

1  this, possibly:  I came from being a state court judge, people

2  appeared before me every day agreeing on what the sentence was

3  going to be, they knew what the sentence was going to be, and

4  all I had to do was decide whether I thought it was in the

5  ballpark, and if they agreed on it, that was the sentence I

6  imposed.  In the federal system, it's different.

7  Notwithstanding the fact that we do it differently here, I still

8  have an inclination, frankly, to the view that the parties know

9  the case better than I do.  You've been in it for much longer

10  than I have and you make concessions and negotiations and pleas,

11  and I want to give effect to what you all intend.  And that's my

12  general view.  So I need a little bit of guidance from you.

13          MR. WOODWARD:  Well, yes, Your Honor.  I think a

14  couple things.  First of all, case is a little bit strange in

15  the sense of as you look at the statement of facts -- and I put

16  in Mr. Villanueva's, I didn't put in Mr. Naim's -- but it's

17  similar.  I mean, these three individuals -- those two

18  individuals and my client were all included, but they all, it

19  was all -- it was separate.  I think you have Mr. Naim and

20  Mr. Villanueva went to Judge Smith.  But certainly in working

21  with the government I didn't -- perhaps erroneously -- in my

22  position paper, in my look at the presentence report, I didn't

23  say that the numbers were calculated wrong; that the probation

24  office had made any mistake.  I think the number we're at now is

25  a reflection and an understanding of both of the parties that it

1   accurately reflects Mr. Caragan's involvement and is a true

2   picture of what he did and didn't do.

3          In thinking about it today, I analogize it a little

4   bit -- and this is not perfect -- to like a drug weight

5   calculation, almost, where you might have a case where the

6   entire case has a bigger number of weight, perhaps, in the

7   drugs, but each individual defendant gets to address the Court

8   or hopefully be judged on what is actually attributable to them.

9   So again, I understand that's not a perfect analogy, but I kind

10  of thought of it that way when I discussed it with the United

11  States Attorneys, that it's intended to reflect what I think we

12  all believe is a true picture of Mr. Caragan's involvement and

13  culpability given the fact that, again, in this case, there's

14  no -- as I said in my position paper, the government got all of

15  the products that they paid for.  Now, it's not, that's not a

16  defense, but it's who was -- the real problem here is who was

17  selling them those products and under what condition?  It's not

18  a like a tax case or a mortgage fraud case or something where

19  the government is actually out money, it's more of an enrichment

20  issue for people that perhaps shouldn't have gotten.  But the

21  government, if --

22          THE COURT:  Let me ask you something.  I want to --

23  this kind of, I think, maybe relates to both issues, the loss

24  and the restitution.  I want to make sure I understand how these

25  contracts work.  Was this contract that was awarded, these

```
1   contracts were awarded, going to be awarded to a small business
2   in any case?  In other words, if they hadn't gone to Karda, were
3   they going to have gone to another small business or were they
4   going to have been placed out for a bid in a bidding process?
5   Because you know, if they were going to be put out for a bidding
6   process you could see that there might have been a smaller --
7   the total contract price might have eventually been smaller, but
8   if they were all going to go to either Karda or some other small
9   business who is likely to have the same kind of structure and
10  costs and getting-up-to-speed costs, you may well be talking
11  about the same contract cost.
12          MR. WOODWARD:  Yes, Your Honor.  My understanding --
13  and again, there's a lot of variables, but the short answer to
14  your question is yes, when you see the word set aside, what that
15  means is that the government, it's not just small businesses,
16  it's small and what they call perhaps disadvantaged.  In other
17  words, as you know from the facts of the case, the reason Mr.
18  Caragan was recruited to become involved in this is because he's
19  of Filipino decent.  So you know, they have a certain amount of
20  business -- and I don't know the whole -- but in this case, the
21  government set aside a certain amount, and I don't know the
22  percentages or the amount, and said these 8(a) businesses,
23  whether it's Karda or some other 8(a) business, we're going to
24  give them this much business no matter what.  Now, within that,
25  once -- for example, as I understand it, and Mr. Young or Mr.
```

```
 1   Salsbury can correct me -- let's say that the government says
 2   we're going to do X, $10 billion are set aside for this type of
 3   work to 8(a) companies.  There's still a bidding process.  I
 4   mean, there's still, you know, they go back and forth.  We want,
 5   in this case, military equipment.  We want night vision goggles
 6   or we want ballistic vests or we want whatever it is we want,
 7   they still -- don't know if negotiate is the right word, but
 8   that business, if you were a big defense contractor you wouldn't
 9   have the right to bid on that tranche of business, because
10   that's been set aside for these types of companies.
11           THE COURT:  Okay.
12           MR. WOODWARD:  So I don't think there's any allegation
13   in the case that there was -- and I guess we're mixing and
14   matching -- but look, in terms of the other issue, I don't
15   disagree with the figure.  The issue in terms of the Harvey
16   case, is that --
17           THE COURT:  Talking about restitution now?
18           MR. WOODWARD:  Yeah.  There's not really any, there's
19   nobody to pay it to.  It's a win -- I mean, the government --
20   you know, I certainly don't disagree with the theory that if
21   they had not done what they did that some other 8(a) company may
22   have gotten that business.  That gets a little murky because the
23   government needs the materials.  So if -- again, as I understand
24   it, if we needed 100 night vision goggles and it's a set-aside,
25   they first give 8(a) companies a chance to do that piece of
```

1  business.  But at some point if there's no 8(a) company that

2  comes up and says, okay, we can get you the night vision goggles

3  and the vests at the price that works, they're not going to send

4  the troops off without the vest and the night vision goggles,

5  they're going to go procure them from somewhere.  So I think,

6  well, the only, the only disagreement -- and I looked briefly, I

7  did not get the government's paper until a few minute before you

8  walked in, I was in the courthouse early meeting with Mr.

9  Caragan, I don't -- the only real disagreement that I have with

10  the whole restitution thing is there has to be some identifiable

11  victim.  And I think it's a stretch to call the government a

12  victim here.  And I told Mr. Salsbury, we're coming in, if there

13  was some company that had bid for that work and they didn't get

14  the contract and they said, well, you gave the contract in this

15  case to Karda and it turned out, you know, Mr. Caragan, while he

16  worked there, really wasn't running the company and they weren't

17  a correct 8(a), and but for that, we would have gotten that

18  business, then I would understand who the victim is.  And that's

19  probably true.  They probably would have gone to some 8(a).  But

20  I don't know that we know that.  And I certainly think that

21  ordering Mr. Caragan to pay the government money is more

22  probably of a policy issue than this case -- because Mr. Caragan

23  has, Your Honor, cooperated fully.  He understands -- I mean, he

24  came in to this expecting to be ordered to pay some sort of

25  restitution.  And he, as you saw, already completely paid on

1  time a civil forfeiture in part of the case.  It's just -- maybe

2  it's just me, but it just seems like a windfall to the

3  government.

4          THE COURT:  Okay.  We've kind of veered over into

5  restitution.  But on the loss amount, in other words, if I leave

6  the loss amount as-is in the presentence report, I think that's

7  the better view, I still can give effect to the party's

8  agreement by essentially varying to what the guideline would

9  have otherwise been and start there?

10          MR. WOODWARD:  Well, and yes, Your Honor.  I know

11  we've got to get to all that.  There's a 5K and all of that to

12  talk about.  But I don't, I guess what I would say, maybe it

13  doesn't help the Court, but we made that agreement that that's

14  how Mr. Caragan ought to be treated.  I don't disagree that,

15  when you look at the case writ large, including all the

16  activities of Mr. Caragan, Mr. Naim and Mr. Villanueva, that the

17  number in the presentence report is the correct number.  And I

18  don't think, I don't -- and I don't think the government

19  disagrees either, that the number that we agreed to is the

20  number you should use as the starting point for Mr. Caragan.

21  And if the Court --

22          THE COURT:  So maybe that's a joint variance argument?

23          MR. WOODWARD:  I would think, I would argue to the

24  extent that's a variance, then that would be the position I

25  think that fits into that slot.

1              THE COURT:  Okay.  Thank you.

2              Mr. Young?  Mr. Young, on the loss issue, is that a

3   way that to, you know, proceed kind of, since there's no formal

4   objection but there's some kind of agreement here, treat it as a

5   variance argument?

6              MR. YOUNG:  Yes.  The government has no objection to

7   that approach whatsoever.

8              THE COURT:  Okay.

9              MR. YOUNG:  A few words of appreciation, Your Honor.

10  Because these losses at issue both under the guidelines and for

11  purposes of restitution are quite abstruse at times, we felt it

12  was important to submit a supplemental filing.  We appreciate

13  the Court reviewing that.  We also appreciate defense counsel

14  agreeing there's not really a factual dispute here.

15              For purposes of Paragraph 38 and the 2B1.1 loss

16  amount, we agree.  We think the best course in the absence of

17  any objections is to keep that figure and the associated fine

18  table in the PSR, and then as I think the Court has intuited

19  from reading our sentencing submission, our sentencing

20  submission was predicated on the motion that we had an

21  obligation to seek a just sentence that avoided unwarranted

22  sentencing disparities, and we think treating that request as

23  essentially a joint motion for a downward variance accomplishes

24  exactly that goal.

25              THE COURT:  And this really wasn't litigated really

1   before Judge Smith in her case, was it?

2          MR. YOUNG:  Well, Your Honor, by way of background, in

3   that case Mr. Villanueva's statement of facts included the full

4   dollar amount that he received in income from the two scam

5   companies, SEK and Karda.

6          THE COURT:  And he was under a different guideline

7   section?

8          MR. YOUNG:  That's correct.  He was under 2C1.1.

9          THE COURT:  Okay.

10          MR. YOUNG:  Exactly so.  The PSR in Mr. Villanueva's

11   case attributed him with that full income amount as both

12   guidelines and restitution loss.  He then objected and said

13   shouldn't it be not my full marginal income, but my marginal

14   income that you can trace directly to 8(a) contracts.  And given

15   there is a disagreement in the appellate courts about how to do

16   this and given that we felt that the corresponding guideline

17   range appropriately would punish Mr. Villanueva, we acceded to

18   that objection.  And then having done that we felt that we had

19   an obligation to approach Mr. Caragan's defense counsel and

20   offer him precisely the same methodology for purposes of

21   restitution.

22          THE COURT:  All right.  I follow that.

23          So let me say, I guess I should say something about

24   the issue, the loss issue.  So loss and restitution are

25   different in that in determining what the loss amount is for

1  purposes of the guideline determination you're really looking,

2  what we are aiming at is trying to determine what is the

3  culpability of the defendant, because the greater the

4  culpability, the higher the guideline range and presumably the

5  higher the sentence.  So that's really what we're trying to get

6  to.  And so the guidelines use the actual loss intended loss.

7  You're trying to -- I mean, there's a list of things in the

8  guidelines, but you're trying to get to what did this person

9  intend to do?  So in other words, the way I think about it is

10 how bad was his behavior, and if it was worse, then the sentence

11 should be higher than if it was less culpable.

12           MR. YOUNG:  So far I agree entirely, Your Honor.

13           THE COURT:  So that's the way I think about loss for

14 guidelines purposes calculation.  And I certainly -- and I

15 understand that there's this kind of split amongst the circuits,

16 and the Fourth Circuit has taken a position on one side of that

17 split of how loss should be calculated.  And I understand that

18 the guidelines, this guideline was amended after the Fourth

19 Circuit's case law on how to calculate loss in this context, but

20 I'm also aware that that Fourth Circuit case that came before

21 the guidelines were amended looked at the special rules in 2B1.1

22 as the basis for how it was calculating loss.  And I'm also

23 aware about the statutory presumption of the value of the

24 contract essentially being the loss for guideline purposes.  I

25 think it was the Singh case from the D.C. District that

1   discussed that.

2          And so while with Mr. Villanueva, for example, the

3   separate guideline provision at play made it understandable that

4   you might use the individual's income as the proxy or the loss

5   amount for guideline purposes, we have a little bit different

6   situation here, and in light of that unique difference,

7   recognizing still your desire to treat defendants fairly within

8   the same scheme, I'm going to -- and mindful that there's no

9   formal objection -- I'm going to leave the loss amount as it is

10  in the presentence report, but when we get to the point of

11  talking about sentencing you all can just remind me what the

12  guideline range would have been had we used the income as the

13  proxy, and from a variance standpoint I'll look at that.

14          MR. YOUNG:  We appreciate that, Your Honor.

15          THE COURT:  All right.  So now stay with me for a

16  second.

17          MR. YOUNG:  Yes, Your Honor.

18          THE COURT:  Mr. Woodward addressed the restitution

19  issue.  So again, you all kind of have agreed here, but in the

20  restitution context I have a mandatory obligation to calculate

21  restitution accurately.  And the government is -- you all have,

22  I should say, sought to use the income obtained by the defendant

23  as the actual loss figure in restitution.  And by way of

24  comparison, as I said earlier, when you're talking about a

25  guideline loss, you're talking about culpability:  What was the

1  actual or intended loss?  How culpable is the defendant?  Here,

2  we're trying to, in the restitution context, figure out what the

3  actual loss was to the victim and seek to account for that.

4      The presentence report has used the profits of the

5  company.  1.4 million is that figure.  You all have suggested I

6  use the $242,000 figure, the income figure.  But I'm still, I

7  can't get my mind around the idea that the government has

8  actually lost something if, in fact, it would have had to pay

9  essentially the same thing that it paid this company for

10 obtaining the items.  And if in fact it's a set-aside and you

11 would have sought to go to another small business, you know, in

12 my mind, I kind of look at that and say, well, all these small

13 disadvantaged businesses are -- the idea is they need to learn

14 the business, you know?  We want to accommodate them.  It's

15 likely that there's going to be a little bit higher contract

16 cost in that context.  And so if the contract had not gone to

17 Karda but the government had gone to some other small

18 disadvantaged business, the contract price is likely to be very

19 similar.  And so in this case the government got its stuff.  If

20 you had gone, if the government had gone to somebody else in a

21 non-fraudulent way, had gone to somebody else, the government

22 would have still gotten its stuff and it would have still likely

23 paid the same amount.  So what is the loss -- is there any loss

24 to the government?

25      MR. YOUNG:  Yes.

1   THE COURT:  That's where I really, you know,

2   bottom-line, I think am struggling.

3   MR. YOUNG:  May I take a crack at defending our

4   position?  The answer to your question is yes, there is loss.

5   THE COURT:  Okay.

6   MR. YOUNG:  The courts that have determined that the

7   loss amount is not zero in this context all work from the same

8   premise, which is in these procurement fraud cases involving set

9   aside programs, the government did not get what it bargained

10  for.  The government bargained for paying a certain amount for

11  the goods, the backpacks, the helmets, the boots and so on, but

12  it also bargained that the experience attendant to those

13  contracts -- and critically for purposes of our theory here --

14  the marginal profit on those contracts go to a legitimate

15  set-aside company that would then reinvest those profits back

16  into the business to gain the experience consonant with the

17  program.  So in effect, Your Honor, I think the theory of, say,

18  the Seventh and Eleventh Circuits -- and I note here, as we

19  pointed out in our position paper, the Eleventh Circuit is

20  totally comfortable attributing full contract value as

21  restitution loss in these cases on the theory that the

22  government didn't get what it bargained for.  We've adopted a

23  much more conservative position.

24  THE COURT:  So the loss, you're saying the loss to the

25  government -- the government, though, is the one that lost out

1    on -- what is it -- an opportunity to benefit some other

2    disadvantaged company?  Isn't that a benefit to somebody else,

3    not the government?

4          MR. YOUNG:  Here's how we conceptualize it.  And I

5    understand exactly the point Your Honor is making.  I think the

6    right way to think about it is the government is the short-term

7    victim, and the legitimate 8(a) that didn't get the contract is

8    the long-term victim.  In effect, when we seek restitution in

9    these cases the government is stepping into the shoes of that

10   long-term victim so that it can take the restitution dollars and

11   invest them in legitimate 8(a) contracts.

12         In our paper, and also before Judge Smith during the

13   Villanueva sentencing where a similar argument was raised under

14   3553(a), we have analogized these cases essentially to theft

15   right?  It's a contract for $100 worth of boots with a

16   ten-dollar profit margin, so the total contract price is $110.

17   We agree that as to the exchange of the $100 for the boots,

18   arguably no loss, setting the Eleventh Circuit aside.  But that

19   ten dollars, in effect what happened in these cases is that this

20   defendant, Villanueva and Naim stole those ten dollars and

21   pocketed it, when it was the government's intention to transfer

22   those ten dollars in profit if its treasury or contracting

23   office to a legitimate company.  And indeed the restitution

24   order we've proposed in this case embodies that theory.  Federal

25   government writ large as the victim here.  It would be, I think,

1  consistent with that proposition to simply turn over all

2  restitution funds to the general funded treasury.  But what

3  we've done is actually gone to contracting offices that were

4  defrauded by this defendant and identified them as individual

5  victims in Attachment A to the restitution order precisely on

6  the theory that the way to make the government whole, to get the

7  government back those ten dollars in marginal profits that were

8  stolen, is for Mr. Caragan to return that money to those

9  contracting offices so that if the contracting office wants to

10  buy $100 worth of boots in the future, it can do so giving that

11  contract to a legitimate 8(a) program and those ten dollars that

12  the defendant stole will be given to that long-term victim.

13         So I agree with the Court completely that there is --

14         THE COURT:  So hold on a second.  The purpose of these

15  disadvantaged and set-aside programs is it's a societal purpose

16  that Congress has decided to bestow or to award to accomplish

17  the societal goal of what?

18         MR. YOUNG:  I think varied slightly by program in the

19  following sense:  There are some programs that don't have time

20  horizons, that don't have, I think, the woman small-owned

21  business and the service disabled veterans are programs like

22  this.  In those programs, Congress and the Small Business

23  Association have simply made a determination it is good for

24  society, I think as the court says, that those companies have

25  some sort of leg up in the contracting process.

```
 1              The 8(a) program, which is what's at stake here, is
 2    different.  And the reason it's different, and this is contained
 3    in the statement of facts in this case, is that the 8(a) program
 4    has a nine-year time horizon.  So I think the policy embodying
 5    the 8(a) program is very specific.  It is this:  Congress and
 6    the SBA have made a determination that companies owned by
 7    certain socially and economically disadvantaged persons who
 8    qualify for the 8(a) program have a difficult time breaking into
 9    the market for government contracts.  They face incumbent
10    players.  They don't have the same resources.  It's a difficult
11    sandbox to play in.  And so what the SBA does through the 8(a)
12    program, they say, okay, for nine years you're going to have
13    access to those set-aside contracts precisely so that you can
14    gain the experience necessary such that at the end of the
15    nine-year time horizon, you can go off and compete on equal
16    footing with the established players.  So in effect, every time
17    the defendant and his co-conspirators fraudulently obtained an
18    8(a) contract, they denied a legitimate company some of the
19    experience that is embodied in the purpose of the program.  And
20    indeed --
21              THE COURT:  So the loss to the government is a loss to
22    the people of the country, and the people in the country by
23    their elected representatives determined that they wanted to,
24    for a limited time horizon, advantage certain disadvantaged
25    companies, individuals, by having this program, and the people
```

1  of the country were deprived of the opportunity to have that

2  purpose fulfilled in this case by the value of the profit, by

3  the profit in this case.  And so you're arguing that the loss to

4  the people of the country -- that's all the government is, the

5  government is just you and me, all of us in this room -- the

6  loss to the people here is the failure, the inability of the

7  government to advantage another properly situated 8(a) company

8  with a comparable amount of contracts, and that therefore the

9  actual loss to the government; that is, the American people who

10  are the victims is the amount that would reflect their inability

11  to advantage some other properly situated company?

12          MR. YOUNG:  I want to say the following, Your Honor:

13  I agree with everything you said, but I want to be careful to

14  insist upon the point that even conceptualized that way, which I

15  think is fair given the policy aims of the program, we still

16  think that, in effect, the marginal profits have been

17  pickpocketed.  It's still a pecuniary loss.  Because the

18  government has a pile of money that it intends to go for the

19  purpose and somebody comes to the government and says give me

20  that money under the veil of fraud.  And in those circumstances,

21  those marginal profits have, in effect, we argue, have been

22  stolen from the government for an illegitimate purpose.  So

23  while I agree with Your Honor completely --

24          THE COURT:  You're talking about restitution?

25          MR. YOUNG:  Yes.

1        THE COURT:  So I didn't catch the difference between

2   what I said and what you're saying.

3        MR. YOUNG:  Oh.  I just wanted to make sure -- and

4   I'll be completely candid, Your Honor, there are, of course,

5   court decisions that I've reviewed, once courts start talking

6   about harms to the American people in the abstract, sometimes

7   that's a prelude to "but in reality, it's zero dollars" in loss.

8   And I just wanted to be sure I agree with the Court insofar as I

9   agree with everything you said about the purpose of the program

10  and why the funds are inappropriately disbursed.  I just want to

11  connect that assertion to our argument that that represents a

12  cognizable pecuniary loss under our...

13        To perhaps give another example, Your Honor, imagine

14  the judiciary had a program whereby an ex-convict could get

15  cleaning contracts to clean the courthouse and it was discovered

16  that a company obtained a contract for that program --

17        THE COURT:  I hope not.

18        MR. YOUNG:  But...

19        THE COURT:  Some other building, but not the

20  courthouse.

21        MR. YOUNG:  But if a company that didn't qualify for

22  that program was earning marginal profits off that contract, I

23  agree the fair value of the services aren't lost, but to the

24  extent that company pocketed profits, I would argue they stole

25  from the judiciary in the same way we argue that Mr. Caragan and

1  the co-conspirators stole from the government.

2        THE COURT:  Mr. Young, when I was a judge in other

3  place I was sitting in my office one night at about 7:00 and a

4  man came in and was cleaning the office, and he looked at me,

5  and there was nobody else in the courthouse, the guards had

6  gone, I was there working late by myself, and he said, Judge, I

7  just want to thank you for not putting me in jail the other day

8  and giving me probation.

9        MR. YOUNG:  Precisely to my point, Your Honor.

10        THE COURT:  It made me feel very secure.

11        MR. YOUNG:  I can imagine.

12        THE COURT:  All right.  Thank you.

13        MR. YOUNG:  Thank you, Your Honor.

14        THE COURT:  Okay.  So Mr. Woodward, you probably don't

15  want to say anything about it, do you?  Maybe you do.

16        MR. WOODWARD:  A couple of things I want to say, Your

17  Honor.

18        First of all, I will tell you just with your last

19  story, one of my family members, I won't name which one,

20  recently got a speeding ticket in Virginia Beach, and I went

21  with her to court, and the officer who had written her the

22  speeding ticket was someone I had represented for possession of

23  marihuana about 15 years ago.  So it happens.

24        THE COURT:  It happens.

25        MR. WOODWARD:  Well, no, Your Honor, I do think -- I

1  mean, look, I've stood in front of you many times and have heard

2  you say we can't make law, and I think with Mr. Young's

3  argument, I mean, he calls it a theory and, you know, imagine

4  this and that.

5          THE COURT:  But did you all agree on this?

6          MR. WOODWARD:  We agreed.  No, sir, we agreed on the

7  number.  We agreed on the number.

8          THE COURT:  242,000.

9          MR. WOODWARD:  242,000.  But where I think -- and

10 look, Mr. Caragan has waived his right to appeal and this is

11 going to be, whatever gets decided here is going to be the end

12 of it.  So I agreed, and if I didn't articulate it, that if you

13 order restitution, the number's 242, but who -- I just can't buy

14 that the government's a victim because they were deprived of

15 some inchoate right.  I mean, his whole argument presumes some

16 8(a) company would have even taken the business.  Remember,

17 they, Your Honor, they have to get the equipment.  And I

18 listened to the back-and-forth, and it just seems speculative to

19 me to say there's no question about the profit.  And as the

20 Court said, you know, the difference between guideline loss and

21 restitution, but I mean, if you think about the road we're on, I

22 mean, you could say that everything Congress does, hopefully, is

23 for some way to benefit the American people, at least as they

24 believe it, every dollar that they spend.  And you know,

25 restitution has always traditionally been you find the person, I

1  stole a thousand dollars from you, I got caught, on one hand the

2  Court's going to punish me for stealing the thousand dollars,

3  but restitution is not punishment, it's to make -- I'm out my

4  money --

5            THE COURT:  Make you whole.

6            MR. WOODWARD:  -- I want my money back.

7            And the other thing that I think is a fallacy in

8  Mr. Young's argument is the idea that if the Court orders Mr.

9  Caragan to pay some amount in restitution to the general

10  treasury, that it's somehow going to go back to the 8(a)

11  program.  I think that passes speculation.

12            THE COURT:  Okay.  Thank you.

13            Shannon?

14            (Court and law clerk conferred.)

15            THE COURT:  So on the restitution issue, it is a

16  thorny, very thorny issue, but I asked you all to look at that

17  Harvey decision which said you can't use the income obtained.

18  But that was not in a set-aside contract context.  And I think

19  there's a lot of merit to the government's argument that the

20  government as the victim; i.e., the American people lost the

21  opportunity advantage some other entity entitled to a set-aside

22  participation contract and the damage was -- at the very least,

23  the amount that can be calculated of the damage is the lost

24  income that didn't go to some other company that would have

25  gotten a set-aside contract, likely, which is a little bit

29

1  different than the Harvey situation.  And so it's such a unique

2  set of circumstances that I think the income obtained is an

3  accurate method of calculating the restitution, and we will use

4  that amount.

5         So those are the issues that we were required to

6  address.  And let see where we are after all of that.

7         All right.  So I'm going to adopt the factual

8  statements that are contained in the presentence report.  I ask

9  the probation officer to make the presentence report reflect my

10  rulings.

11        We move on to discuss the statutory range established

12  by Congress and the President for this particular crime.  The

13  statutory range for the count of which Mr. Caragan has been

14  found guilty is a maximum of 24 months imprisonment.  As for

15  supervised release, Count 1 includes a period of supervision of

16  not more than one year.

17        Does the government agree that's correct?

18        MR. YOUNG:  Yes, Your Honor.

19        THE COURT:  Does the defense?

20        MR. WOODWARD:  Yes, sir.

21        THE COURT:  Operating within that statutory range, of

22  course, are the guidelines promulgated by the United States

23  Sentencing Commission.  Application of the advisory sentencing

24  guidelines in this case results in an offense level of 23 and a

25  criminal history category of I, and the resulting advisory

```
 1   guideline range for Count 1 would be 46 to 57 months of
 2   imprisonment, which would be restricted by the statutory maximum
 3   of 24 months as we just discussed.  Now, as I said earlier, I'm
 4   going to adopt your variance position, but let's just get past
 5   that point.  First at this stage do you all agree that I've
 6   accurately stated that?
 7              MR. YOUNG:  Yes, Your Honor.
 8              THE COURT:  Does the defense?
 9              MR. WOODWARD:  Yes, sir.
10              THE COURT:  Now just so we're all on the same page
11   from a variance standpoint, if the Court were to adopt your
12   argument about the variance, the offense level would have been
13   13, I think, and the criminal history would have been I, and the
14   advisory guideline range would have been 12 to 18 months of
15   imprisonment from a variance standpoint.  Is that right,
16   Mr. Young?
17              MR. YOUNG:  Agreed, Your Honor.
18              MR. WOODWARD:  Yes, sir.
19              THE COURT:  Mr. Woodward?  Okay.
20              All right.  Now, are you all going to have any
21   additional evidence?  Is the government?
22              MR. YOUNG:  No.
23              THE COURT:  Does the defense?
24              MR. WOODWARD:  No, Your Honor.
25              THE COURT:  All right.  I'll be happy to hear from
```

1    you, Mr. Young.

2            MR. YOUNG:  Your Honor, the government, in view of the

3    filing of a motion under 5K, has asked for a sentence of between

4    six and nine months.  And in contemplating why that sentence is

5    appropriate but not more than necessary under the sentencing

6    guidelines, I want to focus on the nature and circumstances of

7    the offense and the need to promote respect for the law and

8    general deterrence.

9            Let me start with the nature and circumstance of the

10   offense.  It is true, of course, that the single-count

11   information to which Mr. Caragan pleaded guilty describes one

12   false statement to the SBA made in July of 2014.  But the

13   statement of facts accompanying his guilty plea makes plain that

14   Mr. Caragan engaged in a multi-year pattern of deception between

15   2010 and 2014.  Now, before I go any further let me start where

16   I think my friend on the other side may start when he steps up

17   to the lecturn, which is the government agrees, that as among

18   the three defendants related to this scheme, Mr. Villanueva,

19   Mr. Naim and this defendant, Mr. Caragan, Mr. Caragan is the

20   least culpable of the three.

21           THE COURT:  Who came forward first?

22           MR. YOUNG:  Mr. Naim.  Mr. Caragan was only involved

23   in half of the scheme.  As the Court is aware from having read

24   both the statement of facts here and the statement of facts

25   relating Mr. Villanueva, this was a nine-year scheme that began

1    in about 2005 and ended in about 2014.  During the first part of

2    that scheme, Mr. Naim and Mr. Villanueva lied about who was

3    controlling a company called SEK Solutions to obtain 8(a)

4    woman-owned business set-aside contracts that they were not

5    eligible for.  But they had a problem, which is that SEK's

6    nine-year membership in the 8(a) program was going to expire in

7    2010.  And they decided that they couldn't live without access

8    to 8(a) contracts, which meant they needed a new 8(a)

9    contracting vehicle.  And their solution to that problem was

10   this defendant, Mr. Caragan.

11           Now, it is entirely consistent with both the statement

12   of facts and the government's understanding of what happened

13   here that there was a period early on in which Mr. Caragan

14   honestly believed that he was going to run Karda Enterprises as

15   a legitimate 8(a) company receiving nothing more than legitimate

16   help from Mr. Naim and Mr. Villanueva.  But very quickly, Your

17   Honor, it became clear that that wasn't going to be true, and

18   the defendant was all too willing to make false and misleading

19   statements to the SBA so that he could continue to serve as the

20   figurehead.  The statement of facts here is utterly explicit on

21   this.  After Mr. Caragan arrived in Virginia Beach to nominally

22   run Karda Enterprises, he worked at a retail storefront and

23   essentially sold small quantities of goods to members of the

24   public.  He had no access to the bank account that Karda used

25   for government contracting.  He really had no insight in the

1  government contracting business at all.  That business was

2  entirely run by Naim, Villanueva and others associated with SEK,

3  all in contravention of SBA regulations.

4          What's more, it wasn't just one lie.  Paragraphs 15

5  through 20 of the statement of facts detail that Mr. Caragan

6  made false statements to the SBA repeatedly.  He made false

7  statements on Karda's 8(a) application where he made the fairly

8  ostentatious claim that he was working 80 hours a week for

9  company for which he was doing nothing of the sort.

10          THE COURT:  Did he prepare that or did Mr. Naim or

11 Mr. Villanueva and just present it to him and say sign it?

12          MR. YOUNG:  Your Honor, as I recall the facts standing

13 here, I have not seen in our fairly extensive document database

14 email traffic about that particular filing, but I will say it is

15 entirely consistent with the facts as we understand them that he

16 wrote almost nothing, and in reality Naim and Villanueva

17 ghost-wrote essentially everything.

18          THE COURT:  How much older is Mr. Villanueva than Mr.

19 Caragan?

20          MR. YOUNG:  I believe Mr. Villanueva is 43 years old,

21 I'm trying to recall from his PSR, and this defendant is 37.

22          And yet, Your Honor, while of course taking the

23 Court's point into account that he was not drafting false

24 documents in the first instance, for years he knew that others

25 were lying in his name and he continued to sign the documents.

1  He signed 8(a) applications, he signed all of Karda's annual

2  8(a) certifications to the SBA.  And in 2014, when the SBA

3  suspecting fraud came knocking and sent him a letter that said

4  who is running Karda, he was content to sign the letter saying

5  that he was in charge of all of Karda's contracting business

6  when, in fact, he was not.  So that's the first thing, Your

7  Honor.

8           Part of the reason the government has not recommended

9  a sentence of simply probation in this case is that, while the

10 defendant might not be as culpable as his co-conspirators, he

11 either made false statements or allowed others to make false

12 statements for him for years in support of a scheme involving

13 $20 million in 8(a) contracts.

14          THE COURT:  After the point by which he realized

15 misrepresentations had been made to him about how the whole

16 company was going to work and what he was going to do, and it

17 was after that point you're saying that he had multiple

18 opportunities to step back and he didn't?

19          MR. YOUNG:  That's exactly right.  And indeed, my

20 friend on the other side attached to the Villanueva statement of

21 facts to his sentencing memorandum, one of the things that

22 happened for example is others would ghost-write communications

23 to the SBA on Mr. Caragan's behalf, and occasionally the SBA had

24 questions, and when the SBA came to Mr. Caragan and asked

25 questions, including questions about who was really running the

1  business, he was content to turn those questions immediately

2  over to his co-conspirators, and then when they came back with

3  false statements, passed those false statements right on to the

4  SBA.  So that's exactly what occurred.

5          THE COURT:  At the time this was all happening,

6  Mr. Villanueva was his brother-in-law?

7          MR. YOUNG:  Correct.

8          THE COURT:  Mr. Villanueva was -- now years of this

9  were '10 to '14?

10          MR. YOUNG:  Correct.

11          THE COURT:  Whereas Mr. Villanueva and Mr. Naim's

12  years of fraudulently operating was '05 to '14?

13          MR. YOUNG:  Correct.

14          THE COURT:  And so Mr. Villanueva was, in 2010, a

15  member of the legislature or...

16          MR. YOUNG:  He was a member of the Virginia Beach City

17  Council for the first half of the conspiracy, then I believe

18  that's correct, Your Honor, from 2010 on, a member of the

19  Virginia House of Delegates.

20          THE COURT:  So his brother-in-law comes to him and

21  says let's do this business together, help set you up, and

22  that's what he thinks is going to happen, and then at some point

23  he realizes, well, I've been lied to, and he's presented with

24  documents to sign and emails to send by his brother-in-law who

25  is older than him and who is a member of the House of Delegates?

1          MR. YOUNG:  Correct.  I agree with the Court's

2   representation.  But the defendant is also in his early to

3   mid-30s during this period.  And it's simply the government's

4   submission, Your Honor, that yes, he was viewed as a front man,

5   as a patsy, as a cut-out by his co-conspirators, but he allowed

6   himself to knowingly be used in that fashion for years, never

7   coming forward and never blowing the whistle as false documents

8   were sent in his name.

9          THE COURT:  Where was he living at the time, 2010 to

10  2014?

11         MR. YOUNG:  Virginia Beach, Your Honor.

12         THE COURT:  But was he living with a family member?

13         MR. YOUNG:  As I stand here I don't know the answer to

14  that question.

15         THE COURT:  And so the PSR paints a picture of sort of

16  a close-knit family based in Virginia Beach, and he comes back

17  to this area to do this business, and he's in this close-knit

18  family, Mr. Villanueva is his brother-in-law and is pushing him

19  to do this.  And the government's theory is notwithstanding all

20  of that pressure, the defendant should serve an active sentence

21  of incarceration because at some point he knew this was

22  criminal, that he was making misrepresentations or should have

23  known, and he should be held responsible for it, but your

24  position is in light of these other factors we think we're

25  asking for a sufficiently low sentence?

37

```
 1              MR. YOUNG:  That's correct, Your Honor.  Indeed after
 2  half the sentence based on the downward variance on the 5K.
 3  Your Honor's point, I think -- and I'll conclude shortly here --
 4  goes to promoting respect for the law and general deterrence,
 5  which is to say this:  There are different varieties of
 6  set-aside schemes, but this kind of follow-on fraud is quite
 7  common, where an entity has access to a valuable set-aside
 8  program, it reaches the end of its term, then it creates some
 9  fraudulent new entity when in reality that new entity is just
10  the old entity in different clothing.  Often in these cases it
11  is somebody like Mr. Caragan who is not as culpable as the
12  people who devised the fraud in the first place, but who has to
13  serve as the friendly face to the SBA in order for those schemes
14  to work.  And the reason the government has asked for some
15  period of incarceration here is these schemes can't work without
16  those people.  Without somebody like Mr. Caragan, the scheme
17  falls apart.  And so while he may have been less culpable than
18  his co-conspirators, he was absolutely integral to the scheme
19  working.  And in the government's view, it would not serve the
20  Congressional purposes of sentencing to say that no prison time
21  whatsoever is appropriate in those circumstances when those
22  kinds of front-persons are absolutely critical for the schemes
23  to operate in the first instance.
24              THE COURT:  All right.  Thank you.
25              MR. YOUNG:  Thank you very much, Your Honor.
```

1          MR. WOODWARD:  Thank you, Your Honor.

2          I would just have to say that I abjectly disagree with

3    their recitement of what should happen here.  I think this --

4    Mr. Villanueva or Mr. Naim would have to be two of the most

5    cynical people that I think I've ever come across in my career.

6    I mean, you have the first scheme where Mr. Caragan is not

7    involved at all.  They use Mr. Naim's wife as the front.  And

8    then as Mr. Young told you, she's out, and it's interesting to

9    me, she's not prosecuted.  She's the front for the first half of

10   the scheme.  You know, we're told it was a woman set-aside in

11   that case.

12         THE COURT:  Maybe she thought she was really going to

13   be involved?

14         MR. WOODWARD:  Well, Your Honor, he stipulated in his

15   statement of facts that she didn't think that.

16         THE COURT:  From the very beginning she didn't think

17   that?

18         MR. WOODWARD:  I don't know -- again, where the

19   realization -- and I would not quibble, I don't think that Mr.

20   Caragan figured out as quickly as Mr. Young said.  But look, he

21   obviously knew at some point because if he didn't he wouldn't

22   have pled guilty.  But the point is just that in terms of -- I

23   mean, that last argument he made rings completely hollow because

24   they didn't prosecute Mr. Naim's wife for doing exactly the same

25   thing that Mr. Caragan did.

```
1              Now, Mr. Caragan was used because he's of Filipino

2   descent.  He wasn't a woman, obviously.  That's his hook-in.

3   And if you look at what happened here, they recruited him.  I

4   mean it wasn't -- he was living up in Northern Virginia, working

5   for a business, he had graduated from ODU, he had never met

6   Mr. Naim.  Mr. Villanueva takes Mr. Naim, they go up, they meet

7   in a hotel room, they recruit him -- those are their words, not

8   mine -- come down here, we'll teach you how to do this.

9              I would also tell the Court that Mr. Villanueva's

10  about 10 or 11 years older than Mr. Caragan, not three or four.

11  He's married to his sister.  Mr. Caragan is the youngest of the

12  children in that family.  Some of the family is here behind me

13  today.  And the Court's right, you kind of took one of my

14  arguments:  They're extremely close-knit.  Extremely insular.

15  Mr. Villanueva was -- and I don't know now -- the star of that

16  family.  He was somebody that Mr. Caragan looked up to.

17  Mr. Young told you that Mr. Naim cooperated first, and I don't

18  dispute that.  All I know was --

19             THE COURT:  Should a sentence -- or should culpability

20  be viewed as less because somebody sort of in that milieu of a

21  really close-knit family where there's perhaps more pressure?

22  You know, I understand the picture that I was parenting and that

23  you're painting.  How should I view that?

24             MR. WOODWARD:  Well, I think yes, Your Honor, in this

25  context when the person who's the mastermind and the leader is
```

1  married to your sister, and they say you should just blow the

2  whistle and quit when you figured this out and not sign the

3  papers -- I will tell you, not to be flippant about it, because

4  this is very serious for Mr. Caragan, when I got into this case

5  and learned the facts and saw how the paperwork was done and

6  what he signed, it reminded me of the TV show MASH where they

7  used to walk around and they would stick something in front of

8  the colonel and he would say what am I signing, Radar?  That's

9  what this was.  Mr. Caragan sat over a little store off

10 Lynnhaven Parkway selling knives and backpacks and stuff like

11 that to the public.  They prepared all of the paperwork.  They

12 sent it to him to sign on those occasions where he questioned

13 it, which he did.  They said that's the way that it's done.  But

14 yes, I think what you have here, he was under tremendous

15 pressure.  He comes down -- you asked where he was living.  He

16 uprooted his life in Northern Virginia, came down here and

17 bought a small townhouse, was living alone, was involved with

18 his family.  Every mitigating factor that a case could have,

19 this case has.

20         I mean, I started to say Mr. Naim may have cooperated

21 first.  I'm sure Mr. Young's being truthful with the Court about

22 this.  All I know is whenever they first asked Mr. Caragan to

23 cooperate he immediately cooperated.  So it wasn't -- I don't

24 want the Court to have the impression that they were after him

25 to cooperate and had to push him to do it or anything.  Whenever

1    they came to him and said we want to sit down and talk to you, I

2    don't know the -- but the first time we could get an appointment

3    scheduled, he sat down.  He told them all that.

4              And the other thing, Your Honor, that I think is

5    mitigating is the main reason that Mr. Villanueva got prosecuted

6    is Mr. Caragan.  Mr. Caragan still has to live in that family.

7    Mr. Caragan -- you know, we talk a lot in this case, and I don't

8    want to say that it's, in this court, danger, but a lot of times

9    when the Court considers 5Ks and what to do for people that

10   cooperate with the government, they talk about, well, did you do

11   something that could have put you at risk?  Did you do something

12   that could cause you some kind of external problem out in the

13   street, so to speak?  Mr. Caragan has to live the rest of his

14   life -- I mean Mr. Villanueva, he didn't play that way.  He took

15   them to indictment.  He pled not guilty.  I know that they

16   offered him plea agreements before that.  I didn't represent

17   him.  He originally represented by Jeff Swartz.  Then he came to

18   be represented by a lawyer out in Roanoke, Mr. Bondurant.  I'm

19   not saying that -- that's his right.  But, you know, he got one

20   half of his -- he had a 70 to 87-month guideline.  The

21   government filed a position paper, which I can show the Court,

22   no 5K, no cooperation, asking for a sentence of somewhere

23   between 30 months and five years, and he got 30 months.  Which

24   is one half of his maximum.  And they're asking you to give Mr.

25   Caragan just barely less than one half of his maximum, and

1  Villanueva didn't do anything.

2           THE COURT:  Yes.

3           MR. WOODWARD:  His maximum's -- my client's maximum

4  sentence is 24 months.

5           THE COURT:  I follow you.

6           MR. WOODWARD:  He's cooperated against the most

7  powerful person in his family who is married to his sister and

8  they're saying six to nine.  I mean, it's a little bit less than

9  a half.  But my goodness, if cooperation and a 5K mean anything,

10 that certainly to me would be a sentencing disparity in the

11 wrong way.

12          The other thing that I think is probably one of the

13 most telling things about Mr. Caragan is ever since Naim and

14 Villanueva finally got out of this business, he stayed over

15 there and run Karda legally and correctly as an 8(a) business

16 since 2015.  Now he sits here today, he doesn't have essentially

17 any money.  He's involved in a decertification process.  He's

18 fighting that.  He paid his civil fine.  But you can't look at

19 this case and think that this is a man who is a scam artist, who

20 would ever have done this if it wasn't for the fact he was

21 recruited by his brother-in-law.  He had no experience in

22 government contracting.  When they came to him he was 26 years

23 old.  They came to him, you know, over 12 years ago in 2006 or

24 '7.  He was out of college two or three years and working a job.

25 And they looked around -- I guess, I wasn't there -- and said,

1  well, who is a Filipino that we can get?  And they said, well,

2  I'll go get my young brother-in-law.  He'll do it.  I mean, you

3  can sugarcoat it for Mr. Villanueva, and I don't know the people

4  in the back, I know they're all at least in-laws or something.

5  But that's what happened here.

6          And you know, look, the government decided to

7  prosecute Mr. Caragan.  They decided not to prosecute Mr. Naim's

8  wife.  Maybe she had a better lawyer than Mr. Caragan did, I

9  don't know.  I don't know what she did.  But I know she was the

10 front.

11         And so I would submit to Your Honor he's got a felony

12 conviction, he's fighting for his business, he's done every

13 single thing the government's asked him to do up until he got

14 roped into this.  He'd never had done anything wrong in his

15 life.  Since those people have been out of his life and his

16 business, he hasn't done one single thing wrong.  And I don't

17 think I've ever come to this court with a person who, in my

18 view, there's less of a chance would be a recidivist.  Because

19 if he was going to run that business crooked, why hasn't he been

20 running it crooked since 2015?  He hasn't.  It's undisputed.

21         Now his 8(a), the nine years, you know, they didn't

22 reapply for it because they can't.  And the most -- I think

23 something the Court should also know about him is he, when Naim

24 and Villanueva left, he was kind of out there on an island.  He

25 had some employees and people that were counting on him, and he

1  rolls his sleeves up and learned how to do this the right way.

2  And until this -- you know, obviously this investigation puts a

3  lot of pressure on this business.  And he said to me he's trying

4  to save the business for the employees.  Now, for himself as

5  well.  But I just think he's the kind of person, Your Honor,

6  that probation is 100 percent appropriate.  I know the

7  government argues -- I've never come over here yet whether it

8  was a capital murder case or a DUI where the government didn't

9  stand up and say it's a serious offense.  This is a Class E

10  felony.  And they say, well, we could have indicted him for

11  other stuff, we could have done this or that.  But that's not

12  what they did.  And again, I just think when you put all of that

13  into it and you look at the context of it given the 10 years, I

14  mean Naim and Villanueva, they were running a con when Mister --

15  you know, in 2004 Mr. Caragan was still in high school, or just

16  one year out of high school when they started, or was in

17  college, you know.  This is not something he dreamed up or would

18  have ever done.

19          And the person that came to him -- you know, Mr.

20  Caragan is the youngest of five brothers.  You can see that in

21  the presentence report.  I don't know what was going through

22  Mr. Villanueva's mind, why he picked him as opposed to one of

23  the other brothers.  Did he think he was vulnerable?  Did he

24  think he was naive?  Did he think, you know, Sam will do

25  whatever I tell him to do?  I mean, I can't get inside of

1   Mr. Villanueva's head.  But it wouldn't be a stretch to think

2   that that was the motivation.  And look, he violated the law.

3   He went along with it.  He signed the documents.  He immediately

4   pled guilty, told the government everything they wanted.  And I

5   just would suggest to Your Honor that probation is appropriate.

6   If he's not what I think he is or what it seems to be that he is

7   and he goes out on probation and doesn't do what he's supposed

8   to do, then he'll be back here.  But I would submit to you that

9   no one thinks that that's going to happen, that he's ever going

10  to have any problem again.  And that's why I would ask Your

11  Honor I think that's appropriate for all those reasons in this

12  case.

13          THE COURT:  All right.  Thank you, Mr. Woodward.

14          Why don't we have Mr. Caragan join you there at the

15  podium?

16          So Mr. Caragan, I read your letter, No. 1.  No. 2, you

17  have the right to make a statement right here.  You don't have

18  to, it's up to you.  But if you wish to make a statement, this

19  is your opportunity, last opportunity to do that before

20  sentencing.  Do you wish to make a statement?

21          THE DEFENDANT:  I do.

22          THE COURT:  All right.  Go ahead.

23          THE DEFENDANT:  I want to apologize to the United

24  States government.  I signed that document.  It was the biggest

25  mistake of my life.  I trusted the wrong people who steered me

1  in the wrong way.  And I am ashamed and regretful, and I will

2  never let this happen again.

3          THE COURT:  All right.  Thank you.

4          So Mr. Woodward, is there any reason sentence should

5  not be imposed at this time?

6          MR. WOODWARD:  No, sir.

7          THE COURT:  Before sentencing, the Court is required

8  to review certain factors set out by Congress and the President

9  at 18 U.S. Code, Section 3553(a).  Those factors are designed to

10 ensure that the sentence imposed is sufficient but not greater

11 than necessary to accomplish all of the purposes of sentencing.

12 What we call that the parsimony principle.  I don't have to

13 recite them all, but I've considered them all in imposing

14 sentence, and I've considered all the defendant's and the

15 government's arguments with respect to the guideline calculation

16 and where the sentence should fall, within or outside of these

17 guidelines.  I will use the presentence report as a template for

18 reviewing these factors.

19         We've spent a lot of time today talking about the

20 fraud itself.  The defendant has pled guilty to making false

21 statements to the Small Business Administration.  He was

22 released on a personal recognizance bond on August 2nd, 2018.

23         Defendant is -- is he 38 now?

24         MR. WOODWARD:  He's 38, yes, Your Honor.

25         THE COURT:  38.  I'll change that on the presentence

1  report.

2          And came forward, pled guilty before Judge Krask, and

3  has cooperated.  I don't really need, I think, on this first

4  factor, the nature and circumstances of the offense, to spend a

5  lot of time talking about it, because we've gone back and forth

6  on it.  The manner in which this fraud took place, the manner in

7  which Mr. Caragan was drawn into it.  And I'll make this

8  observation:  In sentencing, the Court looks at the whole person

9  and the whole situation.  And from the standpoint of how easily

10  someone is drawn into criminal activity such as this and from

11  the standpoint of what the collateral consequences are, someone

12  in a tight-knit family, a close community like Mr. Caragan, is

13  viewed by the Court just a little bit differently than someone

14  who is drawn into this kind of activity having no reason to look

15  up to, respect, rely on, trust a person with whom they don't

16  have the kind of relationship that Mr. Caragan did with

17  Mr. Villanueva.  So on the front end the Court considers that.

18          On the back end; that is, the collateral consequences,

19  to someone who pleads guilty and cooperates in the fashion Mr.

20  Caragan has and is still within that family and that close-knit

21  community, it's also very different than somebody who has no

22  significant relationship and is drawn into a situation like

23  this.  That does not mean that Mr. Caragan doesn't isn't

24  responsible.  He's smart.  Even though he was 26 at the time --

25  and who knows how old he was by the time he realized he was

1   being use as a foil, who knows whether he was 28, I don't know

2   exactly, but I know that he must be held responsible for not

3   acting to withdraw from this criminal scheme at the time that he

4   realized he was defrauding the government.  And so the Court

5   must hold him responsible.  But as I said, it's viewed a little

6   bit differently than somebody who's not drawn in in this way, in

7   this context, and doesn't have those collateral consequences.

8   So I factor all of that in.

9          The defendant's history and characteristics and his

10  criminal history is the rest of Factor No. 1.  The defendant

11  really only has this one, age 19 driving by person less than 21

12  years old after consuming alcohol or drugs conviction for which

13  he receives no points back in 2000, and that's it.

14         Comes from a close-knit family.  Raised in the

15  Kempsville area of Virginia Beach, attending Tallwood High

16  School.  Just from a personal history and characteristics

17  standpoint, nothing outstanding in the way that -- he didn't

18  suffer any abuse.  He was raised, in other words, in sort of a

19  typical middle class family, and the Court considers that.

20         He enjoys general good health.  There's no history of

21  psychological or psychiatric treatment.

22         He has a college education from ODU, and he was a

23  contributing member of society.

24         Looking at the employment record.  Good employment

25  record.  Graduates, goes off eventually to Northern Virginia and

1 then is drawn back here while working at good jobs for somebody

2 of his age and situation.

3          The Court is also required to consider the need for

4 the sentence to reflect the seriousness of the offense.  And the

5 government argues that notwithstanding the fact that he

6 cooperated and that they have made a motion, a 5K motion

7 seeking -- asking the Court to sentence in a way that reflects

8 the cooperation and recognizes it, that they think that a

9 sentence of six to 12 months would be appropriate -- six to nine

10 months, I should say, would be appropriate in this case, and

11 primarily because there should be a disincentive to people

12 exhibited by the sentence to participate in this kind of

13 activity, and that it's common that people like the defendant

14 are the ones that are drawn in to this.  Do I think that a

15 larger sentence would in some general deterrence fashion make

16 the public less likely to be drawn into this kind of situation

17 and more wary?  I don't know that I can really say that when I

18 look at the contextual way in which Mr. Caragan was brought into

19 this.  I'm not unsympathetic to the government's argument, I'm

20 just not sure the degree to which it kind of holds water for

21 purposes of seeking the requested sentence.

22          On the other hand, the defendant argues for just

23 complete probation, no active jail time, no restriction on

24 liberty other than supervised release or the supervision

25 attendant to probation.  And I've been working my way through

1   that, thinking about that a lot throughout yesterday and today.

2   In reaching that point, Congress intended that the court should

3   walk its way through these factors.

4           The seriousness of the offense.  We've talked about

5   another company essentially having been deprived of this

6   opportunity, not to mention the public's confidence in such

7   programs being undercut and the good that's intended to be

8   accomplished by such programs being less likely to occur when

9   the public loses confidence in the program because they see them

10  being taken advantage of in this way.  The Court considers that.

11          The Court is to impose a sentence that promotes

12  respect for the law and provides a just punishment, and I do

13  consider the defendant's role versus the role of the others

14  involved.

15          Deterrence.  We've talked with that.

16          The need to protect the public and the need for

17  education or treatment for the defendant.

18          The need for the sentencing range is to be considered;

19  that is, looking at the actual conduct of the defendant, the

20  victims, the role the defendant played, and whether or not he

21  engaged in any obstruction.

22          And so when I get to that point, when I think my way

23  through all of those factors with this defendant I also have to

24  consider the need to avoid unwarranted sentence disparities.

25  And Mr. Woodward made a good argument about that, this defendant

1   *vis-a-vis* Mr. Villanueva.

2          Our Court of Appeals says that I must consider all the

3   non-frivolous arguments for a downward variance.  I've already

4   talked about the loss amount, our variance argument, talked

5   about the criminal history, lack of propensity to criminal

6   activity, operating business in a legitimate manner after he was

7   out of the influence, out from under the influence of Villanueva

8   and Naim, assisting authorities, the minor role, the defendant's

9   acceptance of responsibility and the way he's conducting himself

10  now.

11         After having carefully considered the guideline range

12  and all the statutory sentencing factors, the Court is now

13  prepared to impose sentence.

14         First of all let me say this:  I would start my

15  thinking by varying down to a 13/I, which is 12 to 18 months as

16  a guideline for sentencing.  Then I've got the 5K1.1 before me.

17  The cooperation.  And you know, once you vary, you're already at

18  a Zone C in the guidelines, which allows the Court to impose a

19  guideline sentence.  Obviously the guidelines are not mandatory,

20  but you know, if you think that this is what is sufficient but

21  not greater than necessary to accomplish the purposes of

22  sentencing, it would be a guideline sentence if I imposed a

23  sentence of imprisonment or a split sentence of imprisonment and

24  supervised release with home confinement as a substitute for

25  incarceration provided that at least one half of the low end of

the guideline range was satisfied by a term of imprisonment,
which would mean I could impose a six-month period of
imprisonment and some period of home confinement.  But then as I
walk through this process I then have the cooperation, and I lay
that on top of that Zone C that's available to the Court from a
guideline perspective, and I have to ask myself is there a
sentence that is sufficient but not greater than necessary, a
sentence that requires the defendant to serve some active period
of incarceration?  And I've turned over the government's
argument on that, and I don't think it's without merit, but I'm
not, I'm not comfortable -- I just don't have a comfort level
with a period of incarceration in this case.  And it has to do
with those collateral consequences, it has to do with the way in
which the defendant was drawn in to this, and I just can't get
there.  But I don't think that just a period, just probation is
appropriate either.  I think there needs to be some restriction
on liberty to accomplish the purposes of sentencing here.

So this may have been a little bit different than what
I was planning to do, Madam Probation Officer, and so let me
know if I need to ultimately make additional statements, but
Pursuant to the Sentencing Reform Act of 1984, it is the
judgment of the Court that the defendant -- actually I think I
need to talk to the probation officer to make sure I state this
accurately.  Can you come on up here?

(Court and probation officer conferred at sidebar.)

1    THE COURT:  So I'm going to impose a period of four

2  years of probation, and that four years of probation as a

3  condition of you being on probation, the first six months you'll

4  be on home detention.  I'm not going to require monitoring, but

5  during that period of home detention, of course, you can go to

6  work, you can go to church, you can go to doctor's appointments,

7  and you can -- I say church, you can go to any, whatever your

8  faith is, house of worship.  And obviously your probation

9  appointments and any other appointments authorized by your

10  probation officer during that period of six months.  But I think

11  that some restriction on your liberty does need to be imposed in

12  this case, and this is my best way of imposing that, I think, on

13  these facts.

14    Within 72 hours of release from this time, you need to

15  report in person to the probation office here so that they can

16  go over all your conditions of probation with you.

17    You present a low risk of future substance abuse, and

18  so I suspended the mandatory condition for substance abuse

19  testing, but the probation office can administer tests if they

20  deem appropriate.

21    While you're on probation you shall not commit another

22  federal, state or local crime, and you shall not unlawfully

23  possess a controlled substance and you shall not possess a

24  firearm or a destructive device, and you shall comply with all

25  the conditions imposed that are the standard conditions imposed

1  on people who are on probation with this court.  I find that

2  they're all appropriate on the facts of this case.

3        You shall not be employed in any capacity involving

4  government contracts because of the way in which this took

5  place.  To the extent there's any question about that, you

6  should consult with your probation officer.

7        You shall provide the probation officer access to any

8  requested financial information.  And you've already entered

9  into an agreement, repayment agreement, right?

10       MR. WOODWARD:  Well, we repaid the civil -- excuse me,

11 Your Honor.  He's paid all of the civil penalties in terms of if

12 the Court's going to order the restitution, then we need to set

13 like a maximum amount.  One thing I would ask you, Your Honor,

14 as you see from the presentence report in terms of the condition

15 of not being employed in government contracting, Mr. Caragan --

16 you know, Karda is still a ongoing enterprise that has current

17 contracts that they're filling, some of which aren't 8(a).  I

18 mean, can we get some sort of period if he's got to quit that or

19 sell that business or get -- the only reason I raise that is

20 that there are people that, you know, he's been running that

21 business since 2015 without -- there's people that were

22 relying --

23       THE COURT:  Are any of those preferential contracts of

24 any kind?

25       MR. WOODWARD:  No, sir.

```
 1              THE COURT:  That's my point.  I don't want --
 2              MR. WOODWARD:  Oh, no more 8(a).  I thought you said
 3    any government contracts.
 4              THE COURT:  Well, let be me be clear about it.  I
 5    don't want him to be benefiting from any kind of set-aside or
 6    preferential government contracts.
 7              MR. WOODWARD:  I understand.  Understood.  When you
 8    said government -- his 8(a) expired and he did, he's, he
 9    couldn't -- but yeah, we will make sure he doesn't --
10              THE COURT:  That's what I am.
11              MR. WOODWARD:  I understand.
12              THE COURT:  As a condition of this probation I don't
13    want him participating in any kind of, in any capacity involving
14    any kind of preferential government contract, whether it be 8(a)
15    or anything else where he would be benefiting to the exclusion
16    of somebody else.  If he participates in some kind of wide open
17    application where everybody's competing, I don't have a problem
18    with that.
19              MR. WOODWARD:  That's right, Your Honor.  And I
20    understand.  I'll stay -- if there's any issue we'll obviously
21    err on the side of caution.  But he is not any longer -- Karda
22    is no longer 8(a) certified and they're not certified under any
23    other set-aside program.  Any business they get they, you know,
24    bid on and they either get it or they don't.  They don't get
25    any --
```

1          THE COURT:  All right.

2          MR. WOODWARD:  -- 8(a) preferences.

3          THE COURT:  All right.  The Court finds that with

4  respect to a fine, that the defendant would be capable of paying

5  a fine; however, all available funds should be applied towards

6  restitution as mandated by statute.  There's a $100 special

7  assessment and with respect to restitution you all have agreed

8  on -- let me find that.

9          The agreement.  Where is the agreement reflected?

10          MR. WOODWARD:  Your Honor, it's being passed up right

11  now.

12          THE COURT:  Oh.

13          MR. WOODWARD:  Your Honor, in regard to that, as I

14  told the Court, Mr. Caragan is undergoing the debarment process.

15  I don't know how that's going to go.  I don't represent him, but

16  there's a possibility he'll be prohibited from doing any

17  government contracting.  Until that fleshes itself out, could we

18  do the restitution at 100 per month?  Because I just don't

19  know --

20          (Counsel and defendant conferred.)

21          THE DEFENDANT:  Your Honor, I plan on scheduling a

22  meeting with the suspension officials up in Washington Navy Yard

23  in Washington, D.C. after this sentencing.  I don't know, I'm

24  not sure if it's going to be in July or August, but if I can

25  have allowance to drive up there to speak with them in that

1   meeting?

2           THE COURT:  I'm sure the probation officer will

3   accommodate you for that purpose.  But Mr. Young, you want to

4   say something?

5           MR. YOUNG:  Oh, I just wanted to say, because I knew

6   that defense counsel would be contesting the appropriateness of

7   restitution under Harvey, I took the signature block off of the

8   proposed order for the defendant and defense counsel, but I

9   understand defense counsel to have said on the record there's no

10  objection to the dollar figure in the order.

11          THE COURT:  All right.  Let me just look at it.  I

12  need to fill in the amount of the payment that's been requested

13  to start at $100?

14          MR. WOODWARD:  Right.  And Mr. Caragan will have an

15  obligation to keep his probation officer apprised of his

16  financial situation good or bad, and obviously if that needs to

17  be addressed or adjusted we can address that as need be.  But I

18  expect if he has that meeting in August, that we'll know by

19  September or October whether, you know, whether it's going to

20  survive, Karda, and if it doesn't, he'll have to go out and find

21  some other employment.

22          THE COURT:  What am I to do?  I mean, we have

23  restitution as to various entities, but your

24  restitution order -- yes, it does break it down.  You did it.

25  Okay.  Never mind.

```
1            MR. WOODWARD:  It's in the back.

2            THE COURT:  Let's let Mr. Woodward sign this order and

3    then you can pass it up to me.

4            So now it provides that it's an amount, Mr. Woodward,

5    or 25 percent of net income, whichever is greater.  And you're

6    asking me to do what?

7            MR. WOODWARD:  One hundred dollars a month for the

8    first, maybe, three or four months, or...

9            THE COURT:  Well, I'm just going to start, I'm just

10   going to say $100 a month or 25 percent of net income, and I'll

11   start it 90 days after.

12           MR. WOODWARD:  That probably works, Your Honor.

13           THE COURT:  Well, Counsel, it's an unusual case.

14   There was some unusual issues today, and your arguments were

15   very helpful in helping the Court get to the sentence that was

16   sufficient under the parsimony principle, and I appreciate it.

17           MR. WOODWARD:  Thank you, Your Honor.

18           THE COURT:  You all did a good job.

19           MR. YOUNG:  Thank you, Your Honor.

20           THE COURT:  So as part of your plea agreement, Mr.

21   Caragan, you waived your right to appeal, with the exception of

22   certain ineffective assistance of counsel claims that can be

23   brought on direct appeal.  Generally, waivers of appeal are

24   enforceable.  However, if you believe that your waiver is

25   unenforceable then you may present that issue to the U.S. Court
```

59

1   of Appeals.  To do that, you must file a notice of appeal within

2   14 days from the entry of judgment.  If you do not file the

3   notice of appeal on time, you may lose your right to appeal.

4   You have the right to be assisted by an attorney on appeal.  One

5   will be appointed for you by the Court if you cannot afford to

6   hire an attorney.  You may be permitted to file the appeal

7   without payment of the costs if you make a written request to do

8   so.  Also, if you make a request of the clerk's office, someone

9   there will prepare and file the notice of appeal for you.

10          Madam Probation Officer, do I need to address anything

11  else?

12          PROBATION OFFICER:  No, Your Honor.

13          MR. WOODWARD:  No, sir.

14          MR. YOUNG:  Nothing from the government, Your Honor.

15          (Court and courtroom deputy conferred.)

16          THE COURT:  The special assessment of $100 is to be

17  paid in installments of $25 a month until fully paid starting 60

18  days after sentencing.

19          MR. WOODWARD:  Yes, sir.

20          THE COURT:  Okay.  Well, Counsel, thank you.  And Mr.

21  Caragan, I hope I don't see you back here, and I wish you well.

22          THE DEFENDANT:  Thank you.

23          (Whereupon, proceedings concluded at 12:08 p.m.)

24

25

60

*CERTIFICATION*

*I certify that the foregoing is a true, complete and correct transcript of the proceedings held in the above-entitled matter.*

_____

Paul L. McManus, RMR, FCRR

_____

Date